## THE EXCELSIOR.

### FRENCH *v.* THE EXCELSIOR.

*(District Court, E. D. Virginia.* August 5, 1882.)

**1. SALVAGE—SUBJECTS OF SALVAGE—STEAMER ON BAR.**

The large flat-bottomed steamer Excelsior grounded broadside on near high tide, on the eastern shoal of Hampton bar at Hampton Roads. Shortly afterwards another steamer tried in vain to pull her off, and at the next high tide the most powerful tug in those waters, aided by the steamer's own engines, was unable to move her. Thereupon a wrecking schooner in charge of a professional wrecker, and with powerful apparatus, was employed, and, with the aid of a tug, tried during one high tide to move the steamer without success, but at the next succeeded in drawing her off. The tide there runs in strongly, and the evidence showed that a tide sufficient to float her would probably have carried her further upon the bar. *Held,* that she was a subject of salvage, and the services rendered were salvage services.

**2. SAME—COMPENSATION.**

The Excelsior was worth $150,000. No danger was incurred by the wrecking schooner or the tug. There was no agreement as to compensation, but the captain of the wrecker presented a bill for $800, which was refused. *Held,* that the wrecking company was entitled to $700 as salvage.

3. Same—Evidence.
      On a hearing to determine 'the amount of salvage to be awarded for pulling a
      steamer off a bar, evidence as to the sums paid in particular instances for drawing
      off other vessels which had gone aground is inadmissible.

In Admiralty. Libel by W. H. French for salvage services in drawing the steamer Excelsior off from Hampton bar. Decree for libelant.

*Sharp & Hughes*, for libelant.

*White & Garnett*, for respondent.

HUGHES, J. On the 1st day of December, 1881, about 2 o'clock A. M., the large passenger and freight steamer Excelsior, on her way from Norfolk to Washington city, while aiming for Old Point wharf in a thick fog, and endeavoring to avoid the shipping then lying in Hampton Roads, and feeling her way cautiously, drifted with the strong tide then coming in, and grounded on the eastern shoal of Hampton bar, about 1,000 yards from the south end of Old Point wharf. She grounded broadside on, heading to the east. She tried for some time to get off by putting her engines hard at work, but these efforts only served to plant her higher and more firmly upon the bar. She finally desisted, and lay solid aground on the edge of the bar, some 20 feet from the channel. She remained in that position about 28 hours; that is to say, until about 6 A. M. on the 2d of December, when she was finally got off. She was a vessel of 1,350 tons, 240 feet long, and 40 feet wide. She was a steamer of peculiar structure, having been designed as a ferry-boat for transporting trains of cars from landing to landing. Her bottom was exceptionally broad and flat; and she laid flat upon the bar, in such a manner as to require an extraordinary propelling power to pull her off. During her stranding, the weather was good, and there was no heavy wind or sea. The time being December, she was liable to the perils of both wind and sea, and to bilge, and to being strained and damaged, even in good weather, in the position in which she lay. Capt. Parrish, an aged pilot, and one of the commissioners to examine pilots, says the bar is a hard, sandy bar, but not a shifting or quicksand. It is about three miles long. The bar near that point is sometimes bare at low tide, and drops off very steep towards the channel; sinking from a few feet to five fathoms depth. It is a point at which vessels are liable to be stranded. Soon after the Excelsior got aground, the steamer Westover ran upon the bar, bows on; but got off, and then tried to pull the Excelsior off, but failed. Before the late war, an experienced seaman, now agent of the underwriters in Norfolk, Capt. Crellin, got off two or three vessels that had stranded on the bar; and during the war he got off steamers which proved to be much bilged and damaged. Capt. Parrish, who is rather exuberant in his statements, says he has been on the bar "often enough," and seen hundreds of ships on it. Capt. French has assisted three vessels off that bar in late years. During the 1st of December the wind was from the westward, which diminishes the tide on the bar; but on the night of her stranding, before the tug Sampson took hold of the Excelsior, it had been S. S. E. At about 12 on the night of the 1st the

wind changed to the eastward, which increases the tide there. The tide on the morning of the 2d was fuller than it had been the day before at corresponding stages. The tide in these waters varies ordinarily only about three feet, and does so at this point, when not reached by south-westerly winds. Capt. Parrish has seen the bar bare just where the Excelsior lay. There seems to be a considerable difference between the time of the tide in the channel and on the top of the bar, say somewhere from an hour to an hour and a half; but Capt. Parrish says there is no difference of this sort near the edge of the bar, (though he seems to con-tradict this statement in answer to subsequent questions in his cross-ex-amination.) Capt. Crellin says, in certain winds the place is a bad one for vessels going ashore on the Roads side of the bar; and that a heavy vessel going ashore there on a rising tide, without using an anchor to hold her off, would be driven up on the bar by the tide coming flood ; and that if the current was strong enough to cut out the sand from under its bottom, a heavy vessel would work down and become more or less imbedded in the sand; though a flat-bottom vessel would not work down so much as one with a sharp bottom. It is strong currents that make a bottom of sand quick or shifting. In the absence of currents, a sandy bottom, like that under the Excelsior, may be very firm.

It has been already said that, soon after the Excelsior stranded, the steamer Westover went head on upon the same bar, near by, but backed off, and then, having pulled at the Excelsior without success, gave up the undertaking. The Excelsior was next taken hold of by the steam-tug Sampson, of Baltimore, a new boat, stated to be the most powerful tug belonging to Baltimore. The Sampson came to the Excelsior about day-break, or a little before 6 o'clock A. M. on the 1st. She got hold of the steamer's hawser without delay, and went to pulling on her. The hawser was an 8-inch one, and "was a pretty good rope," in the opinion of Capt. Starke of the Sampson. He pulled and swayed on the hawser for some hours. At 6 o'clock, when he began, the tide was at high water. He broke the hawser twice. After pulling one hour and a half, the steamer, which had given aid with her own engines, blew the water out of one of her boilers in order to lighten herself, but kept steam in the other and kept it at work, until within a few minutes before they told the tug to stop. Capt. Starke says it was the power of the tug that broke the rope. The rope had been bought new in the preceding July. Capt. Starke says that, in his judgment, it was impossible for any tug to have pulled the steamer off the bar as she lay when he got to her and when he left her ; and that he told her master, Capt. Beacham, so ; and that she was too high out of the water to admit of it, and was hard aground forward and aft. The like testimony is given by several wit-nesses of experience in such cases. Capt. Starke of the tug Sampson says that he returned to the steamer on the morning of the 2d, before day-break, and that the tide then was worse than it had been on the pre-vious morning. The testimony is that tugs, in pulling at a vessel in the condition in which the Excelsior was, if she is large and hard aground, are without sufficient purchase to draw it off, having none other than

the resistance of water upon the propeller. Where an extraordinary power has to be applied to the stranded vessel, tugs are incapable of exerting it; and the usual course is to obtain the requisite power by planting one or more anchors out in the water, and attaching between them and the grounded vessel the usual mechanical apparatus for heaving her afloat. The tide having considerably subsided by the time the Sampson ceased to pull at the Excelsior, on the morning of the 1st, nothing could be done until the ensuing afternoon, and the approach of another high tide.

On the morning of the 1st December, the agent of the Excelsior in Norfolk, Mr. Keeling, had an interview in that city with the libelant, W. H. French, a professional wrecker, on the subject of getting the steamer off. Capt. French was the owner of the wrecking schooner Joseph Allen, and was a mariner and professional diver and wrecker of several years' experience, and was known to Mr. Keeling as such. After telegrams had passed between Mr. Keeling and the agent of the Excelsior at Old Point, and her master, Capt. Beacham, a telegram came from Old Point, directing Capt. French to come with schooner, anchor, cables, and a good strong tug-boat, at once, before 3 o'clock P. M. Capt. French accordingly made preparations to proceed, with no stipulation as to the compensation he should receive, but giving his own assurance that the charges should be "reasonable." At no time before the service, whether in conversation with Mr. Keeling in Norfolk, or Capt. Beacham on board the Excelsior, did Capt. French mention any specific sum as his charge, but said invariably it should be reasonable; and refused to mention any sum. He did say on one occasion on the steamer, to Capt. Beacham, that he would consult Capt. Joseph Baker (who is the oldest wrecker in Norfolk) as to what it should be. After the ship was got off, and all the parties were in Norfolk, Capt. French presented a bill for $800 for his services. Capt. French undertook the job at the instance of Mr. Keeling, some time after 11 A. M., on the 1st December, and at once made ready the schooner Joseph Allen, which he provided with tackle, wrecking apparatus, two anchors, one a very heavy anchor of 3,500 lbs., a strong 12-inch hawser, a chain cable, and a hoisting engine, the largest used by the Baker Wrecking Company, and set out for Hampton bar in tow of the steam-tug Olive Baker, Capt. Chase, master, stated to be the strongest and best pulling tug in the harbor of Norfolk. Capt. French took along with him his mate, C. H. Godfrey, a professional wrecker; Charles Izon, a professional diver and wrecker; and four or five other men, besides the crew of the Olive Baker. He arrived at the Excelsior with these vessels, wreckers, and wrecking appliances about 3 P. M., having left Berkley about 1 P. M. On being asked by Capt. Beacham, Capt. French at once replied that he thought it would be impossible to pull the vessel off without laying anchor and cable. The anchor was laid S. E. of the steamer by the aid of the tug, and the cable from it was passed through the side chock of the ship, to the schooner on the starboard quarter of the Excelsior. The cable was made taut in time for the tide. There was some delay in getting up steam in the

hoisting engine, from having to fill the boiler with water; and there was some interruption of work afterwards from leakage in the boiler. Capt. French says that they got up steam in the hoisting engine about half past 4, and that they first hauled on the cable to make it taut about that time. He says:

"Between 5 and 6 P. M. of December the 1st we were laying with steam on the hoister, cable taut, waiting for the tide to rise, so as to heave on the cable; and about 6 o'clock we judged it to be high water, or a little after. At that time we were pulling as hard as we could on our cable, and about half past 6 the captain of the Excelsior thought, if the tug would take hold and help, we might start her. I didn't think there was any use. We called her along-side. We gave Capt. Chase a line, and he took hold about 7 o'clock, and we were heaving on the cable all the time. He pulled steadily at first; but the captain thought, by backing up and 'snatching her,' he might move her. He tried that several times, and in the last pull parted the hawser, and did not start her."

Capt. Chase made no further effort that night, after parting the hawser. Mate Godfrey, of the Joseph Allen, says:

"We began heaving on the cable and pulling on the tug at high water, and did not succeed in moving her with cable and tug."

He says the six-foot mark of the Excelsior was out of water at the time,—about 6 o'clock,—that is to say, at high tide. The witnesses of the steamer say that one end of the Excelsior was pulled around on the occasion about 11 feet on the evening of the 1st. I think this statement is improbable. There was thus a failure on this evening to get the ship off by heaving upon the anchor and cable, pulling by the Olive Baker, and, from Capt. Beacham's testimony, heaving on a 1,250 pound anchor which the ship had out. So the effort was given over for the night, after the tide had begun to subside.

I do not think it worth while here to enter into any consideration of the difference of time between the tides on the bar and in the channel. I am sure that when the witnesses spoke of the tide in connection with their efforts to get this vessel off they meant to speak of them as they were at the particular place where the Excelsior lay, and where they were making their exertions to get her off. I cannot believe that they meant to speak of the tides anywhere else; and I feel it to be useless in this examination to consider the variation of the tides in different places. I cannot believe that the tide in the channel would be at high water many moments earlier or later than on the edge of the bar shelving steeply and abruptly down into the channel. Capt. French, with his schooner Joseph Allen, lay by the Excelsior all night, and ordered the Olive Baker, which went off to an inner anchorage, to return before daybreak the next morning. The Allen changed her position from the starboard quarter to the port quarter of the Excelsior, and grounded in the night. Her draught was four feet and a half. Mate Godfrey says:

"On the next morning, at 3 o'clock, we commenced pulling on the cable after getting up steam; we commenced first to pull on a triple purchase, and, when we found that we could not move her, we put an extra tackle and com-

menced pulling on that. As soon as we commenced pulling on that, she commenced coming off, about quarter past 5 that morning. We pulled her 20 feet, as near as I can guess at, by cable, which I looked at when it was pulled in. The Olive Baker had come at 5 o'clock that morning. Between 5 and 6 the Excelsior gave her a hawser by Capt. French's orders. She went ahead, and pulled the Excelsior's head around."

Charles Izon, the wrecker, confirms the foregoing, and, on being asked whether, "during the time the Excelsior was moving that twenty feet under the strain on the cable and anchor, the ship's engines and the tug were co-operating to get her off, or whether it was solely by heaving on the cable," answered: "Altogether by the cable. The tug was not pulling on her, nor were the engines of the Excelsior moving," at the time she was so moving. Capt. French says:

"I called Charles Izon to get steam about 2 or 2½ in the morning. I turned out shortly afterwards, called all hands, went aboard the Excelsior, and got ready to go to work. Pulled on our fall that led to the cable, led our main purchase on the hoister, pulled all we could pull well, and then put on a buff tackle and pulled awhile. Then stopped to wait for the tide. Did not move her before we stopped. In a few minutes we worked on the hoister again, and found she was coming. This was about half-past 5 A. M. We pulled her off about twenty feet. Got about twenty feet on our cable, and found she was coming a little too easy for a buff tackle. We took that off, and led the main purchase aboard of the schooner again, then called the Olive Baker to take a line to the Excelsior, and told the captain of the Excelsior to work the port wheel, that was on the inshore side. We went ahead on our hoister as fast as we could, and the Excelsior went right off. She was afloat about 6 o'clock, I judge. Olive Baker took hold of her, and just about had time to tighten her line when she went right off. The hour of high water that morning, as near as I can judge, was from half-past 6 to 7, with that easterly wind. If we had had no anchor or cable there, the effect of a strong northeasterly wind and swelling sea that day upon a steamer stranded broadside on the outer ledge of the bar would have been, not to take the vessel off, but to put her higher up."

Capt. Beacham says:

"At 3 A. M. next morning the second officer awoke me, and said the tugboat Sampson was there, and wanted to know if I wanted him to pull at me at high water. I said 'No,' we would easily get off with the tug we had. I got up at half-past 4, and went down on the main deck. The first man I saw was French. I asked him to take coffee. He said he had had coffee. I asked him if he had steam. He said, 'Yes.' I told him he had better pull on her a little, which he did, to get the slack of his hawser up. I then measured the water on our starboard side, (which was the channel side,) and found 8 feet 6 inches of water. Then the tug-boat Baker came, gave us his line by request of one of my mates, I think, put it in our chock on the starboard side. He gave us the line on his own accord, and I then told my engineers to work my engines one ahead and one back to shake her. I wanted to see if she was afloat. I found she was afloat. French was then standing on our starboard side with an oar overboard. After the tug got steam on us I told my engineers to go ahead on both engines. The hoisting engine was not at work at this time. When the Excelsior's engines went ahead, she shot right ahead, and the tug-boat pulled our bow around, and went ahead so fast that the Joseph Allen broke away from us. We came off the bar and swung around to the hawser of the Allen, and we then came to Norfolk under our own steam."

I do not know that this evidence of Capt. Beacham necessarily conflicts with that of Capt. French, Izon, and Godfrey. They would seem to have got the vessel to moving, and to have brought her to the extreme edge of the channel, in 8 feet 6 inches of water, unconsciously to Capt. Beacham. She seemed to have moved so insensibly that Capt. French could not verify the fact except by putting an oar overboard to mark the movement. It was after the Excelsior had been thus brought to deeper water that Capt. Beacham ordered both his engines to work, and that the ship "shot off." Capt. Beacham makes statements in his evidence, doubtless in perfect good faith, which I find it hard to credit. He says that the hawser of his ship, upon which he depended for the Sampson to pull him off on the first morning, and which he allowed the Olive Baker to use the first evening and second morning, was "very rotten anyhow." He says that he would have been lying with his fine ship on Hampton bar till now, before he would have consented to pay $800 to Capt. French to get her off. He says that the Excelsior could have lain where she was a year without receiving any injury, and this, whatever might be the changes of weather or sea. After sending for a wrecking schooner, with anchor, cable, and other things, and bringing professional wreckers and their appliances to his vessel's side and aid, he represents that he did not wish to use them; speaks of Capt. French's movements in planting his anchor and rigging his hoisting engine and cable as "fooling around" his ship; and implies finally, if not stating in terms, that the assistance rendered by the wreckers on the morning of the 2d was of no avail or efficiency, and that his vessel went off the bar easily when the tide came, for which he had been waiting; went off by force of her own engines. I can't help feeling that such statements, made in excess of zeal, and no doubt made in good faith, impair the value of Capt. Beacham's testimony. Though he testifies, if not expressly, at least by implication, that Capt. French did nothing on the second morning for the ship, yet Mr. Plant, one of his ship's stockholders, who was on board, and who was up and awake all night, says that he timed by his watch, and that Capt. French was at work an hour and fifty minutes before the vessel moved. If she moved at half-past 5, then Capt. French had been at work since 40 minutes after 3 A. M. If Engineer McDonnell testifies rightly, when he says that his order to his fireman was to have steam at 5 that morning, his engines could have had very little to do with getting the ship in motion; and this inference is the stronger from the fact that Capt. Beacham seemed unconscious of what Capt. French was doing.

My conclusion, founded on a heavy preponderance of testimony in this case, is that the Excelsior was stranded beyond the power of her own engines and anchor and cable to pull her off; that the use of her own engines in such an effort could only aggravate her predicament; that she was planted on the edge of that bar so firmly that it was beyond the capacity of the most powerful tug to get her off; that the use of the heaviest anchor and most powerful hoisting engine, cables, and

tackle accessible in Norfolk was necessary to her relief; that application was made to a professional wrecker at Norfolk for wrecking appliances; and that they were furnished by the libelant, and the wrecking service was rendered—successfully rendered—by him without previous stipulation fixing the amount of compensation for the service.

Evidence was taken by the respondent, before the commissioner in this case, of Capt. Howes, master of the ocean steamer W. H. Crane, designed to show what Capt. Howes had paid for tug service and other assistance he employed when his ship was on one occasion aground in the upper part of Chesapeake bay. Evidence was also taken, by the respondent, of Mr. Plant, as to what he had paid for getting some other vessel off that was once grounded near the mouth of the Potomac river. It would have been competent to ask either of these witnesses, as experienced steam-boat men, what price per day or hour was usually paid to powerful tugs employed in getting off large vessels stranded on bars, and what was the usual cost of labor, and what the hire of wrecking apparatus in such work; but evidence (taken without previous notice to the opposite party) of some of the particulars of such a service, and of but one witness as to that service, there being no pretense that the whole truth or facts are given, especially where most of the service seems to have been performed by contract, is not competent testimony in any case under judicial examination; and I do not feel at liberty to consider the testimony given by Capt. Howes, or that given by Mr. Plant, respecting the vessel or vessels which they respectively alluded to as stranded in the waters of the Chesapeake.

In the sketch of the evidence which I have thus given, I have had reference almost exclusively to the question whether this was or not a case of salvage. It is useless for me, after the elaborate manner in which the question of salvage was treated in the recent cases of *The Sandringham,* 10 Fed. Rep. 556, and *The Mary E. Dana,* 17 Fed. Rep. 353, to discuss here at length the law of salvage. That this was a case of salvage is clear. The ship was hard aground broadside on, upon a ledge of sand, where every exertion of her own engines would only tend to plant her more firmly upon the bar. She repeatedly tried these, with the assistance of a cable heaved upon her own large anchor of 1,250 pounds, and of the propeller Sampson and Olive Baker successively, the most powerful steam-tugs in these waters; but tried in vain. Even the use of the large anchor and cable of Capt. French, aided by her own heavy anchor and cable, and her own engines, and by the Olive Baker, was unavailing to the Excelsior on the evening of the 1st December. I cannot entertain a doubt that it was by the agency of the libelant's anchor and cable on the morning of the 2d December that she was finally drawn off. That she could not have got off with her own engines on that morning, against a higher tide than that which carried her on the bar on the morning of the 1st, reinforced by a strong easterly wind, but would have been driven further on the bar, seems to me to be almost as certain as a mathematical truth. It is clear, therefore, that the vessel was beyond the reach of self-help and self-rescue. She was also in a situation be-

yond the capacity of the most powerful steam-tugs to rescue her. Two of these and the steamer Westover had tried in vain to pull her off. She was therefore a subject for salvage. She employed wreckers to perform a salvage service. She was actually rescued by the wreckers, and the service performed in rescuing her was a salvage service. Being a salvage service, this is a case for a greater reward than that of mere compensation for work and labor done. The libelant is entitled not only to such compensation, but also to a reasonable reward as bounty for his enterprise, and for the use of expensive wrecking apparatus always liable to loss, wear and tear, and deterioration.

As to the compensation, the respondent concedes that this may be $300, by the deposit of that amount in court. I think that on this score a fair allowance would be $350. As to reward or bounty, the case is not one to justify a large amount. A vessel ashore on Hampton bar is probably less at risk than on any other ground on the Atlantic seaboard; and wreckers, wrecking vessels, and wrecking apparatus are probably as little at risk in hauling ships off that bar as from any oth r shallow place in this part of the world. There is no element in this salvage service which calls for more than a moderate award, except the extraordinary value of the vessel saved, (her value being proved to be $180,000,) and the success of the libelant in getting her off speedily and unharmed. I think, therefore, that in such a case as this the idea of precentage must be discarded, and that a lump sum should be given as bounty, having no direct reference to the extraordinary value of the Excelsior. This may be the same as the compensation which has been named. I will give a decree for $700 and costs. This amount is within the sum advised by Capt. Joseph Baker before the libelant rendered his bill for $800, expressing his own estimate of the value of his services, and but little within that estimate. I do not think I would be justified in this case in giving a higher award than the libelant's own original demand.