BAKER SALVAGE CO. *v.* THE EXCELSIOR.

*(District Court, E. D. Virginia.* February 20, 1884.)

SALVAGE SERVICE—AWARD.
  A large passenger and freight steamer, worth $150,000, having a cargo worth $10,000, was run into by a tug, which stove a hole in her hull, some six by eight feet in size, causing her to fill with water, and she was beached on Hampton bar, in Hampton Roads. Salvors were telegraphed for, to Norfolk, who came with wrecking steamers, schooner, steam-tugs, pumps, and diving and wrecking apparatus. A diver went down, and, with plank and canvass, battened the hole. Pumps were then set to work, which emptied the hull of the water. The cargo was all got off without loss or damage. The steamer was floated, and towed 12 miles into port at Norfolk. All further injury to the steamer or her machinery was prevented. It was in December, and a severe storm from the eastward could have wrecked the steamer. None occurred, and the work of the salvors was accomplished within 48 hours. *Held*, that the service was a salvage service, and that the reward should bear some relation to the value of the property saved. Six thousand dollars decreed.

In Admiralty. Libel for salvage.

The passenger and freight steamer Excelsior, belonging to the Potomac Steam-boat Company, claimants in this suit,—Theodore E. Baldwin, master,—left her wharf in Norfolk at 5 P. M. on the fourth of December, 1882, on her regular trip to Washington City. She was valued at $150,000. She had a cargo worth $10,000, and the usual number of passengers, and her regular crew, on board. After passing Sewell's point, and in making for the wharf at Fortress Monroe, she came in collision with the United States naval tug Fortune, which drove a hole into her hull, on the starboard bow, some eight by ten feet in dimensions. Capt. Baldwin immediately made for Hampton bar, and at about 6:15 P. M. beached her about midway of that bar, about four miles from Sewell's point, a mile from the Soldiers' Home, and a mile and a half from Old Point Comfort wharf. She went upon, and lay nearly at right angles with, the bar; her bow in six feet, and her stern in ten or eleven feet, water. She had filled

with water, and laid easily on the bottom. The sea came over the main deck, aft, at high tide; but did not cover the deck amid-ships or forward. Her cargo was amid-ships, and was not reached by the water. She was in a place on the bar, and in a position on the bottom, that rendered her reasonably safe from further injury, except in the event of rough weather from the eastward. In consequence of the width of her guards, which spread out from about three feet at the ends of the steamer to ten or twelve feet at the wheel-houses, the waves of a rough sea would beat under the guards, and endanger the deck and the joiner work, and cabins above it, by lifting and breaking them up, and carrying them away, thereby bringing the cargo and the lives of those on board in peril.

It may be stated here that a board of naval officers, appointed afterwards for the purpose of inquiring into the collision, found that the Fortune was in fault; and the United States government has since compensated the claimants in damages from the accident to the amount of $18,350.86. From this computation of damages the amount due the libelants for salvage in this case was reserved, (to be determined by this court,) as also a bill of $470.70, rendered by the libelants, for services rendered the Excelsior during and after the salvage service was rendered. The board of naval officers, which has been mentioned, found that the direct damage to the Excelsior, done by the Fortune, was $11,795.

After beaching his vessel, Capt. Baldwin went off to Old Point Comfort, and from thence sent the following telegrams to the Baker Wrecking Company, Norfolk:

"FORT MONROE, VA., Dec. 4, 1882.

"Send assistance, with steam-pumps, to Excelsior, on Hampton bar. Get here by low water. BALDWIN."

This telegram reached the telegraph office in Norfolk at 8 P. M. on that night. Capt. Stoddard answered it from Berkeley,[1] but the answer is not in the evidence. Capt. Baldwin's second telegram was as follows:

"DEC. 4, 1882.

"Delay guarantied.

"Bring on steamer Resolute a diver, with appliances.

"T. E. BALDWIN."

This telegram reached the telegraph office at Norfolk at 9:15 P. M. Capt. Stoddard, superintendent of the Baker Salvage Company, left Berkeley shortly after 10 that night, on the wrecking steamer Resolute, with the wrecking schooner Scud in tow, with a diver and diving apparatus, with a portable steam-pump and appliances, and with other wrecking apparatus on board. Not knowing the position

[1] The east and south branches of Elizabeth river meet, and form Norfolk harbor; Norfolk being on the north, Portsmouth on the south, and Berkeley in the fork of the two rivers.

on the bar where the Excelsior was, Capt. Stoddard went directly to Old Point wharf, reaching there at midnight, and finding it high tide at that point. Aiming to reach the Excelsior at low tide, as requested by Capt. Baldwin, Capt. Stoddard remained at the wharf until the approach of morning, and then left for the Excelsior, which he reached at daybreak. On meeting Capt. Baldwin, conversation immediately occurred between the two as to the terms on which Capt. Stoddard was to proceed with the work for which he had been summoned. Capt. Baldwin's statement, reduced after the conversation to writing, but never shown to Capt. Stoddard, was as follows:

"It was agreed that there was to be no salvage. The said Baker Salvage Company agreed to raise and float the steamer Excelsior and tow her to Norfolk, Va.; the work to be done as quickly as possible, the bills to be rendered, and, in the event of the said Baker Salvage Company and the Potomac Steam-boat Company not agreeing as to the amount charged for services rendered, then the question was to be settled by arbitration."

Capt. Stoddard, while positively denying any stipulation that there should be "no salvage," substantially admits that there was an understanding as to arbitration in the event of a disputed bill for services. The Excelsior lay about midway of Hampton bar, on its south side, about fifty to a hundred yards from the channel. As before said, she was full of water and submerged to her main deck, the water at high tide rising over the main deck aft. The hole that had been driven into her by the Fortune extended from her hurricane deck far down under the water. Most of her cargo was amid-ships, free from the water. Capt. Stoddard put the wrecking schooner Scud along-side, with a view to taking off the cargo. The diving apparatus was put on board the steamer, and the diver sent down to make examination into the extent of the wound which the steamer had received. Meanwhile Capt. Stoddard went back with the Resolute to Old Point wharf, where he employed a number of laborers to aid in handling the cargo, and procured a quantity of plank lumber with which to batten up the hole in the hull of the Excelsior. Returning with these laborers and this lumber to the steamer, the cargo was put in course of being transferred on the Scud to Old Point wharf, and the diver and his gang employed themselves in battening the hole in the hull. The removal of the cargo was successfully effected without any loss or damage by the latter part of the afternoon of the 5th; the officers and crew of the Excelsior rendering assistance in the work, and the two wrecking vessels making two or three trips each to the wharf. The diver and his assistants could not complete their task that day, and had to suspend work at nightfall till morning. At night a breeze set in from the eastward, producing a rather rough sea, and creating apprehensions in the minds of the officers of the two steamers. At Capt. Baldwin's request, the Resolute was put on the starboard (windward) side of the Excelsior and made fast to her, with fenders placed to prevent injury to the guards and sides of the

vessels. While the sea continued rough, it was a laborious task to keep these fenders in place, and to replace such of them as would be crushed between the two steamers. This task and that of keeping the vessels lashed together, subjected the seamen engaged to more or less danger of limb and life. The Resolute also was in more danger, lashed to the sunken steamer, in the event of a storm, than if she had been at anchor out in the harbor. The object of having the Resolute close at hand was to be in readiness to save life in the event of a storm. Fortunately, however, instead of the breeze increasing on the night of the 5th, it ceased about 1 o'clock, and the weather continued good from that time until the enterprise was finally completed.

The portable steam-pump of the Baker Company had been set up on the Excelsior in the afternoon of the 5th. On the next morning the diver and his gang resumed their work, and were assisted in putting canvass over the planking by the action of the portable pump, which had been made ready for use the afternoon before. The stationary pump on the Resolute was, on that morning, put in connection with the operations on the Excelsior in such manner as to be ready to render effectual assistance. About 12 M. on the 6th the driver completed his task of stopping the hole in the hull with plank, and covering it with canvass, and both pumps were set to work at their full capacity. The wrecking steam-tug Olive Baker had been before that time ordered to the assistance of Capt. Stoddard, and had a tow-line attached to the Excelsior. By about 2 P. M. the pumps had done their work so effectually that the steamer went 'afloat in tow of the Olive Baker. She was soon afterwards got under way, and, with the further assistance of the wrecking steamer Victoria J. Peed, belonging to the Baker Company, and their tug Olive Branch, was towed to her wharf at Norfolk; the pumps being worked during the voyage by the Resolute. The latter steamer lay by her at her wharf at Norfolk, on the night of the 6th, doing such pumping as occasion required. During the voyage from Hampton bar to Norfolk there was, of course, no other covering upon the hole in the Excelsior's hull but of inch pine plank, overlaid with canvass, which was liable to be punctured by encounter with logs or other hard substances in the channel. This danger rendered it necessary to provide every precaution against such an accident, by which she might be sunk to the bottom of the channel. During the period of this service the libelants' tug Nettie was employed in errands between Berkeley and Old Point, under the direction of Capt. Stoddard. Before the Excelsior left Norfolk to go to Baltimore for repairs, certain necessary work was put upon and done for her by the libelants, to the value of $470.70, as assessed by the board of naval officers before mentioned. These are the subjects of a second libel. The libelants are a corporation chartered expressly as a wrecking and salvage company, and expensively and elaborately equipped with wrecking steamers, tugs, lifeboats, steam-pumps, donkey-engines, heavy and light anchors, chains,

cables, falls, diving apparatus, and skilled wreckers and divers, and are capable of rendering prompt and effectual salvage service, at short notice, on the Atlantic and Gulf coasts, and in the West Indies.

*Ellis & Kerr*, for libelants.

*White & Garrett*, for claimants.

*Edmund Waddill*, U. S. Atty., and *Sharp & Hughes*, for the United States.

HUGHES, J. Obviously, the service rendered by these libelants to the Excelsior was a meritorious salvage service. They were telegraphed for as salvors. They left Norfolk and went to the Excelsior for the purpose of rendering salvage service. If their agent, Capt. Stoddard, had assented to the protestation of Capt. Baldwin that this was not to be a salvage service, he would not have altered the fact, or destroyed the rights of his employes as salvors, or changed the character of the service already entered upon. It is not the policy of the law maritime, when a vessel is in peril and has invoked the services of salvors, and these have gone to her for the purpose of rendering salvage assistance, to listen to stories of sharp bargains, driven at the instant, in the endeavor to change the character and lower the grade of the service about to be rendered. The law of the subject is laid down by the United States supreme court in the case of *The Camanche*, 8 Wall. 477, in which the answer alleged that the services were rendered under an agreement for a fixed sum, and were therefore not salvage services. The court said: "An agreement of the kind suggested is no defense to a meritorious claim for salvage, unless it is set up in the answer with an averment of tender or payment." In the present case there was no fixed sum agreed upon, and, of course, none tendered. There was an agreement that the compensation should be left to arbitration, in the event of a future disagreement as to the amount to be paid. As to such agreements, the supreme court of the United States, in *The Camanche Case*, said that "nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage." This, therefore, was a salvage service, and it is an attribute of such a service that it entitles the salvor not merely to the ordinary compensation for work and labor performed, materials furnished, and money laid out and expended,—which are allowed and are computed at the usual rates commanded in the market by such services,—but to a *reward* in addition, given on the principle of encouraging daring and enterprising men to be in readiness, and to be prompt and adventurous, in giving aid to ships in distress, and rescuing lives and property in peril of the sea. The reward is gauged according to the peril in which the persons or property rescued may be; and if the thing saved be property, according, in some degree, to its value.

In one respect this was a highly meritorious salvage service; for all the cargo was saved, without any loss or damage whatever, and the ship herself was saved without damage of any sort to her beyond what she had received in the collision which sunk her.     This being indisputably so, the only further point of inquiry is as to the danger in which the Excelsior and her cargo were, from which they were taken by the salvors; and as to the hazard encountered by the salvors, and their vessels and material, in the course of the service which they rendered.     That a large and expensively furnished bay and river steamer, with first-class boilers, engines, and machinery in her hold, lying full of water on the bottom, at a place where a heavy sea could easily effect her destruction, was in very great *possible* danger, is quite clear.     This danger of possible *destruction* on a December night, though not certain, was imminent, and depended entirely on the caprice of the winds.     The danger of greater or less *injury* to her machinery, her hull, her joiner-work, and cabins, and her decks, from lying in the water submerged, with a hole in her sides of 50 superficial feet, was certain and absolute.     She could not be removed from the position in which she was until the hole in her hull was closed, and made water-tight.     This needed to be speedily and effectually done; it needed the services of one who was not only an experienced diver, but a workman of skill; and of the greater skill from the work having to be done under water.     Not only was such a diver with such experience absolutely requisite, but after he had accomplished his task, and to some extent while it was in progress, steam-pumps of exceptional size, power, and efficiency were necessary to empty the ship of the water with which she was full, and to empty it expeditiously, without mishap or delay.     And, after the vessel was thus—by the work of the diver and of the pumps—made ready to be floated, it was of the highest importance that towing appliances and vessels should be in readiness to take the ship promptly into port, thoroughly guarded from the peradventure of accident to her frail and weakened hull at every step.     All this was accomplished in a thoroughly skillful and successful manner by the salvors.

The complainants have not shown that there were other skilled persons, with ample outfit of divers, steamers, and wrecking vessels and apparatus, at hand, by whose instrumentality this ship and her cargo could have been rescued from the danger they were in, speedily enough to have prevented the irreparable damages that would have resulted from her lying long in the water.     That fact could not have been proved; and this court has had such an iteration of evidence in such a large number of cases to the same effect, that it is now at liberty to assume, until the contrary is shown, that the Baker Salvage Company is the only fully equipped wrecking company available at all times for the most arduous and difficult salvage work, that is to be found anywhere south of the Delaware capes on the Atlantic seaboard.     I think the danger of *injury* which the Excelsior was in

was very great; and she was certainly in danger of possible *destruction* from a rough sea, if one had set in, which, by thumping up under her very wide guards, might have lifted and ripped up her main deck, and broken up and wrecked all that was above it. Possible danger, which chanced not to have actually occurred, to a vessel in danger, may always be considered as interpreting the spirit with which the salvors worked, and illustrating the merit of their conduct; but is seldom made, of itself, the ground of materially increasing their reward. As to the danger in which the Resolute and her crew were during the rough part of the night of the fifth of December, I do not think it was actually great. That there was ground for apprehending danger is proved by Capt. Baldwin having requested that the Resolute should lie close along-side of him; and that the Resolute was by Capt. Stoddard willingly subjected to the risk of taking that position, shows that the salvors were ready and prompt to encounter the risks incident to salvage service. On the whole, I think this was a meritorious salvage service, deserving high commendation for the spirit, skill, and success with which it was rendered; but not of high grade when considered with reference to the risks and dangers incident to it; yet of sufficient merit in both respects to justify a graduation of the reward in some degree by the value of the property saved.

Except for the stress laid by claimants' counsel upon the matter, it would hardly be worth while to indicate the marked distinction between this case and the case of the same steamer Excelsior, when, in December, 1881, she was by accident run on Hampton bar, not far from where she was beached by Capt. Baldwin. For the first case see 5 Hughes, 416. There is in fact no similarity between the two cases, except that the vessel was the same and the bar on which she was grounded the same. In the former case, the Excelsior was merely aground, though so fast aground, by reason of her bottom being exceptionally broad and flat, that she could not be pulled off by tugs, and resort had to be made to wrecking anchors and cables. It is true that the services of a wrecker were called for, and the apparatus of wreckers employed. By the use of these means, and by taking advantage of the tides, which were waited for, the steamer was floated, and then proceeded on her voyage. She had been merely delayed. I believe none of her cargo was removed. On the authority of abundant precedent, I held that the case was one of salvage, but of salvage of a very low grade. It was more than a case of tugging and towing. It was a case for the use of wrecking anchors and cables, and for wrecking services. On this ground alone, I allowed, in addition to compensation by the rule of *quantum meruit*, a reward of $350. It was not a case for the reward to be made to bear any relation to the value of the property saved, which then was $180,000.

In contrasting the present case with that, it is unnecessary to advert further than already done to the circumstances under which the

present libelants found the Excelsior in Hampton roads,—sunk to her main deck on the bottom; full of water; with a hole in her hull, graphically described by one of the witnesses as "big enough for a street car to pass through;" with $10,000 worth of cargo on board nearly reached by water, on the main deck; with this deck and all above it liable to be lifted off and broken up by a heavy sea from the eastward; and with injuries inflicted by collision upon her hull to an extent then painfully and apprehensively unknown, but since discovered to be more than $10,000 could repair. The only elements of safety in the condition of the Excelsior were that she was squarely bottomed on one of the bars which skirt Hampton roads, and that she was within 12 miles of Norfolk, on the border of one of the safest anchorages and most capacious roadsteads for shipping in the world. The success with which she was saved, with all her cargo, was due to two causes, viz.: *First,* to the accident that no heavy wind or sea arose during the 42 December hours when she lay on the bottom; and, *second,* to the consummate skill with which the salvors performed their work. Though the former accident, that of good weather, may go to the diminution of the salvage reward, the latter should not. It is the characteristic of these salvors that, whenever success is possible, they perform their work with such facility and perfect success as to produce the impression on those who are benefited that their labors have not been difficult enough to deserve a liberal compensation. Such an objection is faulty both in its logic and justice, and I cannot accede to it.

As to what claimants' counsel say of "harbor service," Hampton roads is rather an inland sea than a harbor. It is an anchorage and roadstead, into which sea-going vessels put for safety by hundreds, without a thought of going into port. It is surrounded by headlands, flats, and bars, and there are but two wharves on its entire boundary, and these run out far from land in reaching the channel.

The services rendered by the libelants to the Excelsior in this case were of the same character, though not as tedious, laborious, or difficult, as those which were rendered within the harbor of San Francisco in the case of *The Camanche,* 8 Wall. 448, where the award was one-third of the value of the property saved, where only a part of the property at risk was saved, and where the service was what counsel calls "harbor service." The work there was divers' work, and that of powerful lifting machinery. It was done in the harbor, and in perfect safety, except as to the accidents ordinarily incident to diving and the handling of machinery. Yet in that case, where there was no sea danger, nor much danger of any sort, the award was, as before stated, one-third of the value of that portion of the sunken property which was saved—$25,000 for $75,000.

The case of *The Blackwall,* 10 Wall. 1, was also a notable case of harbor service, in which for a half-hour's work with city fire-engines on board of a harbor tug, a fire on a ship was put out, and $10,000 awarded for saving property worth $100,000.

Salvage services are rewarded in proportion to the danger attending them, to the peril from which the property was rescued, and to the energy, promptitude, skill, and success with which the salvage is affected. When of the requisite grade in these respects, the amount awarded is fixed with some reference to the values saved. In this case I will give a decree for $3\frac{1}{2}$ per cent. of those values, or $5,600. In the second libel filed I will give a decree for the amount claimed, or $470.70.

The libelants claimed in argument 10 per cent. of the value of the property recovered, or $16,000; but as a compromise, to avoid the necessity of suing, reduced the amount of the bill presented to $10,-000. I do not, in view of all the circumstances of the case, feel justified in awarding a larger amount than $6,000, as above stated.